**Russell MAHER, Plaintiff,**

v.

**Forrest David MATHEWS, Secretary, Department of Health, Education and Welfare, Individually and in his official capacity, Defendant.**

Civ. A. No. 75–147.

United States District Court,
D. Delaware.

Sept. 30, 1975.

Peter M. Siegel and Aida Waserstein of Community Legal Aid Society, Inc., Wilmington, Del., for plaintiff.

W. Laird Stabler, Jr., U. S. Atty., Wilmington, Del. and Dorothy Fait, Attorney of the General Counsel's Office of the Department of Health, Education & Welfare, Washington, D. C., of counsel, for defendant.

OPINION

LATCHUM, Chief Judge.

This case is now before the Court for possible disposition under three separate motions: (1) plaintiff's motion for summary judgment pursuant to Rule 56, F.R.Civ.P.; [1] (2) defendant's motion to dismiss pursuant to Rule 12(b)(1), F.R.Civ.P.; [2] and (3) defendant's motion for summary judgment.[3] These motions were filed following a decision issued on June 12, 1975 in which the Court declined to grant preliminary relief to the plaintiff and in which it ten-

1. Docket Item 14.

2. Docket Item 15.

3. Docket Item 11.

tatively certified this action as a class action.[4] Having heard oral argument and considered the briefs submitted in in connection therewith, the Court is now ready to rule on the above matters.

Plaintiff seeks a declaratory judgment[5] declaring unconstitutional the defendant's termination, without advance notice and a pretermination hearing, of the monthly benefits plaintiff had been receiving as a "rollback" enrolled in the Supplemental Security Income program ("SSI," codified in Title 16 of the Social Security Act). SSI is a recently established completely federally funded and administered social welfare scheme that is designed to provide subsistence income[6] for certain categories of individuals. It supersedes all federal grant in aid programs for aid to the permanently and totally disabled ("APTD," former Title 14 of the Social Security Act) which had been both administered and funded in part by the states.[7] Congress adopted enabling legislation for SSI on October 30, 1972, but in order to ensure SSI's orderly implementation, postponed its effective date until January 1, 1974, decided to continue APTD grants in aid during the interim period, and explicitly provided that any person enrolled in an APTD program in December 1973 would automatically be eligible for SSI benefits.[8] Subsequently, in mid-autumn of 1973, having been alerted to and having become alarmed by the reported attempts of certain states to pad their APTD programs with clearly ineligible persons,[9] Congress on the eve of the inauguration of the SSI program amended the "grandfather" provision in the SSI enabling legislation so as to provide that only those persons who had received APTD benefits before July 1973 would be grandfathered into the SSI program. Those persons who had received APTD benefits on or after July 1, 1973 were stripped of such automatic eligibility.[10] It is this classification of APTD beneficiaries, termed "rollbacks," whose rights to procedural due process are at issue in this case.

Russell Maher is a "rollback." Sometime prior to July 1, 1973 he was found eligible for Delaware APTD benefits pursuant to 31 Del.C. § 504 as a perma-

---

4. Docket Item 9. *Cf.* 28 U.S.C. § 2284(3), *Ortiz v. Engelbrecht*, 474 F.2d 977 (C.A.3, 1973).

5. Plaintiff also seeks on his behalf a permanent injunction and a writ of mandamus (1) enjoining defendant, his successors in office, agents and employees and all other persons in active concert and participation with him from terminating *ex parte* plaintiff's SSI benefits, and (2) ordering that SSI back benefits be paid plaintiff pending an oral pretermination hearing. As noted above, the Court has already ruled preliminarily on the motion to certify this action as a class action.

6. Pursuant to 42 U.S.C. § 1382e state governments have the option to pay supplementary benefits to SSI recipients through the federal administrative apparatus. If a state exercises this option, the federal government bears the administrative costs of such payments, but of course the state is expected to reimburse the federal government for the full amount of such supplementary payments. 42 U.S.C. § 1382e(d).

7. However, in some states the federal government is obligated to provide SSI beneficiaries with payments that are higher than basic benefits allowed under the SSI program. Congress imposed this obligation upon the federal government in view of the fact that these states had established very high benefit levels pursuant to their APTD programs and so had incurred substantial expenditures of their own. The SSI enabling legislation created a so-called "hold harmless provision" mandating exclusive federal liability for all or part of the difference between state benefit levels payable under former Title 14 of the Social Security Act in January 1972 and standard SSI benefits. See P.L. 92–603, § 401, 86 Stat. 1486, as modified P.L. 93–233, § 18(h). *See* H.R.No.93–627 (Nov. 9, 1973), 2 U.S. Code Cong. & Admin.News (93d Cong., 1st Sess.) 1973, at pp. 3183, 3204.

8. P.L. 92–603, 86 Stat. 1465, 1471, 1484.

9. See S.Rep.No.93–553 (93d Cong., 1st Sess.) at 250 (1973).

10. P.L. 93–233, § 14, 87 Stat. 965 (December 30, 1973).

mently and totally disabled individual.[11] From and after July 1, 1973 until early December 1973 he received a monthly Delaware APTD check on or about the first of each month. During this period plaintiff apparently had no occasion to consult with the Social Security Administration (SSA) regarding possible SSI benefits and in all probability he was unaware of the impending implementation of the SSI program.

On or about December 21, 1973 plaintiff received in the mail a form letter-notice from the SSA.[12] The front side of the letter-notice was headed in bold face brown print "Supplemental Security Income Payment Decision." Somewhat below this also in brown print there appeared the statement "This is a notice that you are eligible . . . to receive the Supplemental Security Income payment shown above. . . ." Immediately *above* the statement, but in black "computer printout" type, the letter-notice indicated that beginning in January 1974 plaintiff would receive $135 per month which amount included $5 from the State of Delaware. Immediately *below* the statement there appeared two paragraphs that were also printed in black "computer printout" type. These paragraphs read as follows:

"The amount of your check is based on all the information we have. If we get new information later, the amount of your check may change."

"You do not need to file an application to get supplemental security income. A gold-colored U. S. government check for the amount shown above will come to you automatically about the first day of each month. This check will take the place of the checks you now get from your state or local public assistance office."

At the bottom of the front page there appeared in bold face brown print this message: "Important: See other side for an explanation of your appeal rights and other information." On the back page of the letter-notice were several paragraphs in brown print which informed the reader that if he disagreed with "this determination" he could request reconsideration through "his social security office" no later than January 31, 1974 and that "the right to receive supplemental security income carries with it certain responsibilities" explained in a booklet that purportedly was enclosed with the letter-notice.

Plaintiff did receive a SSI check in the amount of $135 on or about January 1, 1974. Subsequently, on or about January 29, 1974 he received a second letter-notice from the SSA with virtually the same brown print portions as the previous communication.[13] It now informed the plaintiff, in black "computer printout" type, that:

"Recently the Congress passed and the President signed legislation increasing the monthly amounts due persons receiving supplemental security income payments. Your new monthly amount [$140] is shown above. You will begin receiving this amount in February. The check you receive in February will be higher than the amount shown above since it includes the increase payment due for January."

On or about February 1, 1974 plaintiff received a SSI check in the amount of $145, which included the $5 retroactive payment for the month of January. The next month, and continuing through June 1974, the SSA provided plaintiff with appropriate and timely monthly SSI benefit checks. However, plaintiff

---

11. 31 Del.C. § 504 (1968 Supp.) reads in relevant part:
 Assistance shall be administered under the following categories:
 \* \* \* \* \*
 (3) Aid to the disabled; assistance granted to needy persons who are permanently and totally disabled, as defined by the Department, who have attained the age of 18, and who have resided in Delaware for a period of 1 year immediately preceding application.

12. Docket Item 2, Exhibit A.

13. Docket Item 2, Exhibit B.

did not receive a SSI check for July 1974. In lieu thereof the SSA sent him a form letter that was dated June 10, 1974.[14] The letter opened with these unexpected statements:

"After a careful review of your case, we have found that you are not eligible to receive supplemental security income payments under the provisions of Title XVI of the Social Security Act."

"Under the law, because you had received a disability payment for December 1973 from a State or local public assistance agency, we have been able to send you supplemental security income payments (in a gold-colored check), but only until a decision about your eligibility could be made."

The letter informed plaintiff that "the law" had established one of two requirements that he must meet in order to be eligible for any further SSI benefits. These were explained as either (1) that plaintiff had received a check for at least one month before July 1973 from a State or local public assistance office paid under an APTD program, or (2) that he was now "disabled as defined under the Federal law." The letter went on to state that the SSA had already "carefully reviewed the evidence" in his case and had found that he did not meet either of these requirements so that the SSA could not pay him SSI benefits in the future. At the bottom of the letter there appeared the standard postscript: "Important: see other side for an explanation of your appeal rights and other information."

Plaintiff began his appeal to the SSA as directed by filling out and submitting a standardized SSA form entitled "Request for Reconsideration" on July 8, 1974.[15] Under the appeal process SSI benefits are not paid a "rollback" while an appeal is pending and unresolved in his favor.[16] If the SSA reverses its ineligibility determination, payment of monthly SSI benefits is thereafter resumed and a "rollback" is reimbursed in full retroactively for all SSI benefits withheld from the date of termination. On October 4, 1974 the SSA informed plaintiff that it had affirmed its initial determination, following a "thorough reexamination" of his case.[17] Sometime after October 10, 1974 plaintiff took the next step in the appeal process by filling out and submitting a form entitled "Request for Hearing."[18] The SSA has not yet conducted a hearing with respect to his claim, so that he is still ineligible for SSI benefits.[19]

The aforementioned series of communiques from the SSA to the plaintiff are explainable only in light of certain actions taken by the Congress and the SSA after January 1, 1974. To begin with, P.L. 93–233, the legislation creating the "rollback" category, did not indicate how the SSA should treat a "rollback" prior to the SSA's determination of his eligibility for SSI benefits under the federal requirements. And while SSA might have been aware throughout late 1973 of Congress' mounting concern about numerous last minute spurious additions to APTD rolls designated for "grandfathering" into the SSI program as of January 1, 1974, the SSA was not equipped to make a speedy and accurate division of APTD recipients into "rollback" and non-"rollback" categories. In large part this paralysis stemmed from the fact that the SSA had decided to phase in the administrative infrastructure and data base of the SSI program by adopting in toto state welfare agency records and case files concerning APTD recipients, records which had not been indexed or catalogued so as to identify readily whether a particular APTD re-

---

14. Docket Item 2, Exhibit C.

15. Docket Item 2, Exhibit D (SSI claimant's carbon copy).

16. 20 CFR § 416.1420.

17. Docket Item 2, Exhibit E.

18. Docket Item 2, Exhibit F (SSI claimant's carbon copy).

19. Plaintiff currently receives $50.00 monthly payments from the Delaware General Assistance Program.

cipient entered the APTD rolls prior to or after July 1, 1973.[20] To make matters worse, the so-called computerized federal payment rolls which were to generate monthly SSI checks beginning with January 1974 had not been programmed to make such distinctions either.[21] Consequently on January 1, 1974 the SSA was faced with the unenviable choice of either not paying SSI benefits to any of the former APTD recipients or of paying such benefits to all of them. SSA chose the latter option on that date.

To legalize this latter decision, the SSA utilized 42 U.S.C. § 1383(a)(4)(B), which allows the SSA to pay SSI benefits for up to three months to any initial applicant who is presumptively disabled and who is otherwise qualified for such benefits.[22] Shortly thereafter on January 21, 1974 the SSA issued proposed regulations further identifying a "presumptively disabled" individual to be (1) any initial applicant for SSI benefits who adduces evidence reflecting a "high degree of probability" that he meets federal SSI disability criteria, or (2) a "rollback."[23] These regulations provided that a "rollback's" eligibility for SSI benefits would end either with the third monthly payment to be made pursuant to 42 U.S.C. § 1383(a)(4)(B), (i. e. on March 31, 1974), or earlier, if the SSA were to make an unfavorable disability determination under the federal SSI criteria. For some reason the SSA did not send a copy of these regulations or any synopsis of them to those "roll-

backs" who had already been identified as such or to the remaining, and as yet, unclassified group of "grandfathered" former APTD recipients. Rather, the SSA simply informed all SSI recipients by letter-notice (i. e. Docket Item 2, Exhibit B in this case) that pursuant to recently enacted legislation the SSA was authorized to increase monthly SSI benefit payments and that it intended to do so. This legislation, of course, was P.L. 93–233, the same law in which Congress created the "rollback" category.

Following promulgation of these proposed regulations the SSA undertook an intensive effort to identify and then process "rollback" cases. Before the end of March 1974 some "rollbacks" had been both identified and determined to be ineligible to receive SSI benefits.[24] Their SSI payments were terminated without advance notice and a pretermination hearing. But in many, if not most states, the SSA still had not sorted out the non-"rollback" files from the "rollback" files.[25] Consequently, with the three month period of presumptive disability slated to end on March 31, 1974, SSA turned to Congress for an extension of authority to continue presumptive disability payments until the end of the calendar year 1974, by which time it estimated that all "rollbacks" would be identified and their eligibility evaluated. Congress passed the requested legislation on March 28, 1975—only three days before the April SSI checks were to be mailed.[26] In so extending the

20. Letter of James B. Cardwell, Social Security Administration Commissioner, to Wilbur D. Mills, Chairman, Committee on Ways and Means, House of Representatives (December 2, 1974). (Attachment to Docket Item 9, C.A. 74–277, *Morrison v. Weinberger*).

21. *Id. See also Cardinale v. Mathews*, 399 F.Supp. 1163, at 1171 (D.D.C.1975).

22. 42 U.S.C. § 1383(a)(4)(B).

23. 39 Fed.Reg. 4116 (February 1, 1974). The Commissioner of Social Security issued the proposed regulations on January 21, 1974, stating that "[t]he rules set forth in the proposed regulations will be applied by the Social Security Administration in order to administer the Supplemental Security Income program during the period from January 1, 1974, when the new program becomes [sic] effective, until final regulations are adopted." 39 Fed.Reg. at 4115. These proposed regulations, to be codified at 20 CFR § 416.954, were published on February 1, 1974.

24. See *Saurino v. Weinberger*, 396 F.Supp. 992 (D.R.I., 1975).

25. H.R. No. 93–871 (March 4, 1974), 2 U.S. Code Cong. & Admin.News 1974, pp. 2808, 2809 (93d Cong., 2d Sess.).

26. P.L. 93–256.

necessary authority, legislative history indicates that Congress was persuaded by the following factors: (1) the SSA's estimate that "a substantial majority" of "rollbacks," when identified and evaluated, would be found eligible for SSI benefits, (2) the great financial burden that would be placed on the states if all the as yet unevaluated "rollbacks" and unprocessed grandfathered former APTD recipients were to turn to state welfare programs for subsistence, and (3) the "harsh and unjust effects of such a suspension [of presumptive disability payments as of March 31, 1974]." However, Congress was fully aware of the SSA's scheme for reviewing "rollback" eligibility—a scheme that did not provide for advance notice and any sort of mandatory pretermination hearing.[27]

When SSA sent plaintiff his March 1974 SSI check, it did not inform him that this might be his last one in view of the fact that SSA was not then authorized to pay him further SSI benefits as a "rollback" or grandfathered former APTD recipient. At no time did SSA request any verification from plaintiff as to when he first enrolled in Delaware's APTD program, a step that could have expedited the SSA's determination of his eligibility for SSI benefits. Nor, once SSA had concluded that plaintiff was indeed a "rollback" did it notify him that his eligibility was under review. Apparently, the SSA did send notices to "rollbacks" in some states informing them of the ongoing review of their eligibility but these notices did not invite a "rollback" to provide current medical information or other data, instead advising him that a state disability determination unit or social security district office might contact him if additional information were needed.[28]

## I. Jurisdiction.

■ Jurisdiction over the subject matter of this case arises from the provisions of the Mandamus Act, 28 U.S.C. § 1361 (1970).[29] Plaintiff alleges that

---

27. In explaining the mechanics of the SSA's processing and evaluation of "rollback" cases, H.R.No.93–871 noted that disability determinations are made by "State disability determination units which handle regular disability determinations under title II of the Social Security Act as well as regular disability determinations for all new applicants filing for SSI on the basis of disability." H.R.No.93–871, 1974 U.S.Code Cong. & Admin.News, at p. 2809. A state disability determination unit is a state agency under contract with the SSA which provides medical information for use in the evaluation of each individual's eligibility for SSI benefits and title II benefits. *Saurino v. Weinberger*, 396 F.Supp. 997 at footnote 7. *See also* discussion *infra* at text accompanying note 37 *infra*.

28. See *Saurino, supra*, 396 F.Supp. 998 at footnote 11; *Ryan v. Shea*, 394 F.Supp. 894, at 897–898 (D.Col., 1974).

29. A three judge district court is not required pursuant to 28 U.S.C. §§ 2282 and 2284 to hear this case. Although plaintiff seeks injunctive relief against the ex parte termination of his SSI benefits and of SSI benefits payable to all other "rollbacks" in Delaware, (Docket Item 2, paragraph VI B) and although 28 U.S.C. § 2282 mandates that "an

interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States be heard by a three judge district court," the complaint expressly places in question the constitutionality of 20 CFR § 416.1420, not that of any federal statute. Moreover, a complaint should be construed as an attack on the constitutionality of an Act of Congress only if "[the regulation complained of] is so plainly directed or permitted by [the Act of Congress] that no fair construction [of the Act] could hold otherwise . . . ." *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106, 115 (C.A.2, 1966), *cert. denied* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966) (Friendly, J.). See *William Jameson & Co. v. Morgenthau*, 307 U.S. 171, 173, 59 S.Ct. 804, 83 L.Ed. 1189 (1939). 20 CFR § 416.1420 is not "plainly directed or permitted" by any Act of Congress because neither 42 U.S.C. § 1382c (a)(3)(E), providing that an individual is to be considered disabled and currently eligible for SSI benefits "if he is permanently and totally disabled as defined under a State plan . . . as in effect for October 1972 and [if he] received aid under such plan (on the basis of disability) for December 1973 (and for at least one month prior to July 1973).

the defendant owes him a clear, ministerial and non-discretionary duty, viz., advance notice and a pretermination hearing as mandated by *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and the due process clause of the Fifth Amendment. Since this allegation is far from frivolous, jurisdiction to consider the merits exists under the Mandamus Act. *Mattern v. Weinberger,* 519 F.2d 150, at 155–157 (C.A. 3, 1975).[30]

. . . ," nor 88 Stat. 52 (P.L. 93–256, Act of March 28, 1974), providing that "any individual who would be considered disabled under . . . [42 U.S.C. § 1382c(a)(3)(E)] except that he did not receive aid under the appropriate state plan for at least one month prior to July 1973 may be considered to be presumptively disabled under . . . [42 U.S.C. § 1383(a) (4)(B)] and may be paid . . . [SSI benefits] as though he had been determined to be disabled . . ., for any month in calendar year 1974 . . . without regard to the three-month limitation in . . . [42 U.S.C. § 1383(a)(4)(B)] on the period for which benefits may be paid to presumptively disabled individuals, *except that no such benefits may be paid on the basis of such presumptive disability for any month after the month in which the Secretary of Health, Education, and Welfare has made a determination as to whether such individual is disabled. . . .*"

(emphasis added),

is a directive on the part of the Congress that the Social Security Administration terminate ex parte SSI benefits otherwise payable to "rollbacks." *Compare Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), where a three judge district court had been convened since the allegedly unconstitutional action was expressly authorized by an implementing statute as well as by regulations issued pursuant thereto (The Lloyd-La Follette Act, 5 U.S.C. § 7501(a) and (b) and regulations discussed 416 U.S. at 140–152). *Accord, Mills v. Richardson,* 464 F.2d 995, 1001 (C.A.2, 1972); *Mattern v. Weinberger,* 377 F.Supp. 906, 916 (E.D.Pa.1974), rev'd in part on other grounds, 519 F.2d 150 (C.A.3, 1975); *Lyons v. Weinberger,* 376 F.Supp. 248, 258 (S.D.N.Y.1974); *National Alliance of Postal & Federal Employees v. Klassen,* 369 F.Supp. 747, 752 (D.D.C.1974); *Pedroza v. Secretary of Health, Education and Welfare,* 382 F.Supp. 916, 919 (D.Puerto Rico, 1974). Therefore the provisions of 28 U.S.C. §§ 2282 and 2284 are inapplicable, and a single judge may proceed to dispose of the outstanding motions.

30. The Supreme Court's recent jurisdictional excursus in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 2462–2468, 45 L.Ed.2d 522 (1975) does not compel the conclusion that this court lacks subject matter jurisdiction of the instant action. *Salfi* explains that 42 U.S.C. § 405(h) deprives a federal district court of subject matter jurisdiction under 28 U.S.C. § 1331 to entertain suit by an individual who is challenging, on constitutional grounds, his ineligibility for benefits under title 2 of the Social Security Act [Federal Old-Age, Survivors and Disability Insurance Benefits program] unless and until the Secretary of Health, Education and Welfare indicates that he has reached a "final decision" (required by 42 U.S.C. § 405(g)) with regard thereto. 42 U.S.C. § 405(h) currently reads in relevant part as follows:

" . . . No action against the United States, the Secretary [of Health, Education and Welfare], or any officer or employee thereof shall be brought under section 41 of title 28 to recover on any claim arising under this subchapter [title 2 of the Social Security Act]."

It is debatable whether 42 U.S.C. § 405(h), which was enacted in 1939 (see 53 Stat. 1362, 1370–1371), was intended to encompass and preempt future jurisdictional provisions under former section 41 of title 28, such as 28 U.S.C. § 1361, the jurisdictional basis for the instant action, i. e., the Mandamus Act (76 Stat. 744, P.L. No. 87–748, Act of October 5, 1962). The Court will assume *arguendo* that it does since the *Salfi* opinion, in presenting the above quoted portion of 42 U.S.C. § 405(h), deletes the phrase "section 41" and substitutes the phrase "§§ 1331 *et seq.*" Moreover, in footnote 3 of the *Salfi* opinion the Supreme Court implies that Congress intended § 405(h) to apply to both preexisting and future grants of subject matter jurisdiction under Title 28. *Salfi,* 95 S.Ct. at 2462, footnote 3.

Nevertheless, it is apparent that the special jurisdictional requirement of 42 U.S.C. § 405(h) *does not* apply to suits challenging the constitutionality of the benefit structure of title 16 of the Social Security Act ["SSI" program, 42 U.S.C. §§ 1381–1383c], or the constitutionality of regulations of the Secretary of Health, Education and Welfare and the Social Security Administration that are issued pursuant to title 16 of the Act. The procedural aspects of the SSI program are found in 42 U.S.C. § 1383 *et seq.* 42 U.S.C. § 1383(c)(1) provides that the Secretary of Health, Education and Welfare must provide reasonable notice and opportunity for a hearing to any individual who disagrees with a

**1174**

II. The Merits.

A. *Plaintiff's Goldberg v. Kelly Rights.*

■ Plaintiff claims "*Goldberg v. Kelly*" protection under the due process clause of the Fifth Amendment against the ex parte termination of his SSI benefits. However, he is deserving of such protection only if he has a property interest in these benefits. *Board of Regents v. Roth*, 408 U.S. 564, 570–571, 576–577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Arnett v. Kennedy*, 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (Powell and Blackmun, JJ., concurring).

In *Goldberg v. Kelly*, the Supreme Court held that once a person is determined to be eligible for welfare benefits in accordance with statutory and administrative standards, he has the unconditional right to continue to receive those benefits unless and until the prop-

er authorities provide him with adequate advance notice and the opportunity for an oral pretermination hearing. In *Roth* the Supreme Court, relying heavily on the *Goldberg* holding, sketched the following definition of the term "property" swathed in the protections of procedural due process: "A person clearly must have more than an abstract need or desire for a benefit . . . more than a unilateral expectation. He must, instead, have a legitimate claim of entitlement to it. . . . [Property interests in a benefit] are created and their dimensions are defined by existing rules or understandings . . . that secure certain benefits and that secure claims of entitlement to those benefits." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

Plaintiff insists that he has three so-called "indicia of a property interest" in SSI benefits. First, plaintiff points to the fact that he received payments under the Delaware APTD program beginning in July 1973 and thereafter until

---

determination concerning his eligibility for SSI benefits. According to 42 U.S.C. § 1383 (c)(3) "the final determination of the Secretary [of Health, Education and Welfare] after a hearing . . . shall be subject to judicial review as provided in section 405(g) of this title [42 U.S.C. § 405(g)] to the same extent as the Secretary's final determinations under section 405 of this title [42 U.S.C. § 405]; except that the determination of the Secretary after such hearings as to any fact shall be final and conclusive and not subject to review by any court." A succeeding section, 42 U.S.C. § 1383(d)(1), specifically states that:

"The provisions of section 407 of this title [42 U.S.C. § 407] and subsections (a), (d), (e) and (f) of section 405 of this title [42 U.S.C. § 405(a), (d), (e) & (f)] shall apply with respect to this part [42 U.S.C. § 1383 *et seq.*, Part B of title 16 of the Social Security Act, or Part B of the 'SSI program'] to the same extent as they apply in the case of subchapter II of this chapter [viz., title 2 of the Social Security Act, or the 'Federal Old-Age, Survivors, and Disability Insurance Benefits program']."

Section 405(h), [42 U.S.C. § 405(h)], the statutory provision which is the focus and crux of Mr. Justice Rehnquist's discussion in *Weinberger v. Salfi, supra*, concerning

subject matter jurisdiction under 28 U.S.C. § 1331 *et seq.*, is not explicitly referred to by the above quoted provisions.

Congress' failure to incorporate section 405 (h) in title 16 of the Social Security Act is crucial in view of the fact that, for example, title 18 of the Social Security Act [Health Insurance for Aged and Disabled, 42 U.S. §§ 1395–1395pp], as codified at 42 U.S.C. § 1395ii does explicitly incorporate by reference section 405(h) with respect to determinations under title 18:

"The provisions of sections 406 and 416(j) of this title, and of subsections (a), (d), (e), (f), (*h*), (i), (j), (k) and (*l*) of section 405 of this title shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter." (emphasis added).

See also 42 U.S.C. § 1395ff (incorporating in part into title 18 the judicial review provided by § 405(g)). Therefore, since title 16 of the Social Security Act *does not* refer to § 405(h), whereas title 18 *does*, it is apparent that there is no provision in title 16 that "[o]n its face, this provision bars district court federal . . . jurisdiction over suits, such as this one, which seek to recover Social Security Benefits." *Weinberger v. Salfi, supra*, 95 S.Ct. at 2462.

the implementation of the SSI program in January 1974. He claims that the eligibility requirements for APTD benefits are the same as, or at least very similar to, the eligibility requirements for SSI and so he concludes that his entitlement to the former benefits created an automatic entitlement to the latter benefits. Second, plaintiff places some emphasis upon the two letter-notices he received from the SSA during December 1973 and late January 1974. He asserts that these induced him to believe that his eligibility for SSI benefits under the federal criteria had been unconditionally established to the satisfaction of the SSA. Finally, plaintiff contends that Congress in enacting P.L. No. 93–256 in late March 1974 did *not* intend that the SSA would or could terminate *ex parte* SSI benefits payable to "rollbacks."

After carefully considering these three contentions, the Court reluctantly concludes that plaintiff did not and does not enjoy a "property interest" in SSI benefits.

■■■ (1) It is clear that the qualifying definition of "disability" under the Delaware APTD program which plaintiff had to satisfy before joining the APTD rolls in July 1973 is more liberal than the corresponding definition of "disability" contained in 42 U.S.C. § 1382c(a)(3)(A)-(D) which the plaintiff must now satisfy in order to receive SSI benefits.

For example, the SSI definition of "disability" in part requires that an individual "[be] unable to engage in any substantial gainful activity," meaning that "he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy, [viz., work which exists in significant number either in the region where such individual lives or in several regions of the country] regardless of whether such work exists in the immediate area in which he lives or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." [31] In contrast the analogous Delaware APTD standards in relevant part simply require that an eligible individual be "substantially precluded from engaging in useful occupations [viz., a productive activity to which a money value is attached] within his competence, such as holding a job." [32] It is fair to conclude that the federal criteria apparently provide that an individual is eligible for SSI only if he is absolutely unable to perform virtually any type of work available, whereas the APTD criteria are not so onerous or restrictive. [33] A similar disparity exists with respect to other corresponding portions of the definitions of "disability" under the SSI program and the Delaware APTD program, [34] and it is of

---

31. 42 U.S.C. § 1382c(a)(3)(A)–(B).

32. Delaware Public Assistance Manual §§ 3200, 3205.3.

33. In order for an individual to be eligible for General Assistance benefits funded by the State of Delaware, he *must be* "incapacitated due to a physical or mental condition which is not totally and permanently disabling" or "*unable to engage* in *any* full or part-time gainful employment because of a physical/mental incapacitating or disabling condition as verified by a physician's statement (PA-16)." Delaware Public Assistance Manual § 3330.4. (emphasis added).

34. According to 42 U.S.C. § 1382c(a)(3)(A), a person must be "unable to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." The relevant corresponding portions of the Delaware Public Assistance Manual, §§ 3205, 3205.1, 3205.2, define "permanently and totally disabled" as an individual who has "some permanent physical or mental impairment, disease, or loss, or a combination thereof. . . . " That is, " 'permanently' refers to a condition which is not likely to improve or which will continue throughout the lifetime of the individual. It may be a condition which is *not likely to respond to any known therapeutic procedure.* . . . The term 'permanently' does not rule out the possibility of vocational rehabilitation or even possible recovery in light of future

no mean significance that the Congress conceived of the SSI program as a replacement for "the multiplicity of requirements and benefit payments under . . . existing state-operated [APTD] programs." [35]

▮ (2) The two letter-notices sent by the SSA to plaintiff between December 1973 and January 1974 [36] do not give rise to a "property interest" within the penumbra of the *Roth* decision because the Supreme Court there commented with respect to statutory benefits that a claim of entitlement must be based upon a valid statutory authorization. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. The December 21, 1973 letter-notice was merely an explanation of the SSI program as it had been conceived and as it then existed, i. e., before the last minute creation of the "rollback" category and at a time when the plaintiff's statutory entitlement to SSI benefits was simply executory. As for the January 1974 letter-notice, it is true that the SSA did not inform plaintiff of the fact that Congress had created the "rollback" category just prior to the inauguration of the SSI program, of the fact that the SSA had been forced to utilize the presumptive disability provision of the SSI program, 42 U.S.C. § 1383(a) (4) (B), in order to legalize payment of SSI benefits to "rollbacks" for up to three months, i. e., through March 31, 1974 or of the fact that his eligibility for SSI benefits might have to be reviewed. However, the SSA's poor performance in this regard could not create an implied contract on plaintiff's behalf to continuous SSI benefits. Compare *Perry v. Sindermann,* 408 U.S. 593, 601–602, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). At best the SSA's letter-notice

might be viewed as giving rise to some type of estoppel against the federal government, but the circumstances in which this can occur are few. *Walsonavich v. United States,* 335 F.2d 96, 100–101 (C.A. 3, 1964); *See United States v. Pennsylvania Chemical Corp.,* 411 U.S. 655, 674, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973); *United States v. Stoeco Homes, Inc.,* 498 F.2d 597, 610–611 (C.A. 3, 1974); *Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380, 384–386, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Miller v. United States,* 500 F.2d 1007 (C.A. 2, 1974). An administrative snafu that creates a misunderstanding on the part of the public, particularly when this occurred during the birth pangs of a novel and gargantuan social welfare program, is insufficient to give rise to estoppel against the federal government. See *Brown v. Richardson,* 395 F.Supp. 185, 189–191 (W.D.Pa.1975). *But see United States Immigration and Naturalization Service v. Hibi,* 414 U.S. 5, 8–9, 94 S.Ct. 19, 38 L.E.2d 7 (1973); *United States v. Wharton,* 514 F.2d 406, 408–411 (C.A. 9, 1975).

▮ (3) The Court finds that at no time did Congress intend that a "rollback" continue to receive SSI benefits unless the SSA were to afford him adequate advance notice and the opportunity for an oral pretermination hearing. The haste with which Congress carved the category of "rollbacks" out of the numerous APTD recipients who were to be grandfathered from pre-existing federal grant-in-aid programs into the SSI program belies any intent to permit continued payment of SSI benefits beginning in January 1974 to "rollbacks" pending a *Goldberg v. Kelly* hearing. Subsequently, in March 1974 the SSA

---

medical advances or changed prognosis. In this sense, the term refers to a condition which continues indefinitely as distinct from one which is temporary or transient. The term 'totally disabled' involves considerations, in addition to those verified through medical findings, such as age, training, skills, and work experience, and the probable functioning of the individual in his particular situation

in light of his impairment." (emphasis added).

35. H.R.Rep.No.92–231 (May 26, 1971), 3 U.S.Code Cong. & Admin.News 1972, at p. 5133 (92d Cong., 2d Sess.).

36. Exhibits A and B (Docket Item 2), respectively.

informed the Congress of the administrative procedure which it was then using and which it intended to continue using in order to screen out those ineligible for SSI benefits from among all "rollbacks."[37] This understanding on the part of Congress is evinced from the Report of the House Ways and Means Committee, accompanying P.L. 93–256:

> "By far the largest and most time-consuming administrative task is that of making disability determinations under the Federal criteria for individuals found not to have received state disability assistance before July 1973. These determinations need to be made by state disability determination units which handle regular disability determinations under title 2 of the Social Security Act as well as regular disability determinations for all new applicants filing for SSI on the basis of disability."[38]

■ As heretofore noted,[39] state disability determination units are not necessarily a forum in which either an initial SSI applicant or a "rollback" can orally present or question evidence regarding his eligibility. This fact, coupled with the failure of the House Ways and Means Committee to seize the opportunity to even suggest, rather than require, that either the SSA process "rollback" cases before processing initial applications for SSI benefits or that it process "rollback" cases in such a way as to afford a "rollback" the opportunity to appear on his own behalf prior to termination of his SSI benefits, leads the Court to conclude that the Congress

was not concerned about providing SSI "rollbacks" who were to be processed after March 31, 1974[40] with the opportunity for an oral pretermination hearing. Although the Report of the House Ways and Means Committee does not specifically note that the SSA had processed "rollback" cases between January and March 1974 by following the above described procedure, it is inconceivable that the SSA failed to so inform the Congress. Above all the report clearly and unambiguously acknowledges the SSA's estimate that "a substantial majority of the people subject to suspension of [SSI] payments [on March 31, 1974] will ultimately be found to be eligible."[41] Hence it is fair to conclude that the Congress, having great faith in the accuracy of the ex parte disability determinations scheduled to be made by the plodding SSA administrative apparatus for all remaining unprocessed "rollback" cases before the end of 1974,[42] implicitly rejected the need for *Goldberg v. Kelly* pretermination hearings. This being the case, the plaintiff cannot base his so-called unconditional and uninterruptable "right" to SSI payments on a statutory-administrative scheme that was envisioned in *Roth* as the necessary foundation of a property interest in social welfare benefits warranting the constitutional protection of on oral pretermination hearing.

■ For the foregoing reasons the Court concludes that since the holdings of *Goldberg v. Kelly* and *Board of Regents v. Roth* are inapplicable in the instant case, the plaintiff did not and does not have a property interest protectable

37. See text accompanying note 24 *supra.*

38. H.R.Rep.No.93–871 (March 4, 1974), 2 U.S.Code Cong. & Admin.News, 1974, pp. 2808, 2809 (93d Cong., 2d Sess.).

39. See note 27 *supra.*

40. P.L. 93–256 gave the SSA the power to pay "presumptive disability benefits" to "rollbacks" from April 1, 1974 until December 31, 1974. See discussion at text accompanying note 26 *supra.*

41. H.R.Rep.No.93–871 (March 4, 1974), 2 U.S.Code Cong. & Admin.News, pp. 2808, 2809 (93d Cong., 2d Sess.).

42. Although aware of the mammoth and complex task facing the SSA in processing "rollback" cases, the House Ways and Means Committee did insist that "the ['rollback' disability] determinations . . . be made as promptly as possible." *Id.* at 2810.

by advance notice and an oral pretermination hearing under the due process clause of the Fifth Amendment.

### B. *Plaintiff's Protection Under The Fifth Amendment From Arbitrary Federal Action.*

Although plaintiff has not established *per se* a right to advance notice and an oral pretermination hearing, the Court now considers his alternative contention that the defendant's refusal to utilize such a procedure before terminating plaintiff's monthly SSI benefits is so arbitrary as to violate the due process clause of the Fifth Amendment. Plaintiff suggests that there are two reasons underlying the defendant's decision to terminate ex parte SSI benefits payable to "rollbacks": (1) many "rollbacks" were reported to have been placed on APTD rolls by state welfare agencies after July 1973 solely in order to be transferred to the SSI program beginning in January 1974 and (2) "rollbacks" do not have a sufficient stake in continued receipt of SSI benefits so as to confer on them the right to advance notice and an oral pretermination hearing. Plaintiff then argues (1) that it is arbitrary to penalize those "rollbacks" who are first determined to be ineligible but who will be reinstated upon appeal, on account of the ultimate ineligibility of other "rollbacks" and (2) that the very nature of SSI, as a subsistence income program, militates against the notion that a "rollback" has an insufficient stake in continued receipt of SSI benefits pending an oral pretermination hearing. In addition, plaintiff contends that defendant's disposition of his case is completely irrational compared with that of those already safely enrolled in SSI or with that of initial applicants for SSI benefits because the former are accorded the full panoply of *Goldberg v. Kelly* protections while the latter have the opportunity to submit extensive current medical information as well as other evidence which

form the foundation for an equitable determination of their eligibility for SSI benefits. Says the plaintiff, it is his misfortune that his SSI ineligibility determination was based upon an allegedly disorganized, mislabeled, and misleading APTD case file and that he was then forced to utilize the cumbersome SSA review procedure, in the first stage of which he had no opportunity to appear personally to state his claim.

 Both the provisions of the Social Security Act and their administration are subject to judicial scrutiny under the due process clause of the Fifth Amendment. *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). A provision of the Social Security Act and/or the method of administration of that provision pass such constitutional muster if the goal is legitimate and if the classification adopted is rationally related to the achievement of those goals. *Weinberger v. Salfi* (1975), 94 S.Ct. at 2468–2469, citing *Richardson v. Belcher,* 404 U.S. 78, 81, 84, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Salsburg's Meats, Inc. v. Shultz,* 363 F.Supp. 269, 273–274 (E.D.Pa.1973). The legislative goal that the SSA has carried out by utilizing ex parte termination for "rollbacks" is the prevention of unwarranted payment of SSI benefits to "ineligible" individuals who first received APTD benefits under joint federal-state programs for aid to the "disabled" prior to the effective date of the SSI program but after July 1973. This goal is a legitimate one. Consequently, the other question before the Court is whether the defendant's termination procedure as applied to "rollbacks" is so irrational that they are denied due process. *Weinberger v. Salfi, supra,* 94 S.Ct. at 2470.

 To begin with, this Court will not assume that the APTD records contain incomplete or stale information, because as the record in this and related cases indicate,[43] the SSA has concluded that, at least in Delaware, the vast ma-

---

43. See Docket Item 9, at 3. See also Docket Item 15, *Talley v. Weinberger* (C.A. 75–21, dismissed as moot, June 12, 1975).

jority of "rollbacks" are eligible for SSI. While it is true that defendant is very much concerned about unnecessary and unwarranted drain from the federal fisc and perhaps only tangentially concerned about the suffering and brutal need which a "rollback" faces when his SSI benefits are terminated without warning, it is equally true that if in January 1974 the defendant had had no reason to believe that most "rollbacks" would be found eligible for SSI solely on the basis of the SSA's reading of state APTD case files, he also must have realized that his decision to determine ex parte their eligibility for SSI benefits was bound to create a flood of appeals that could very well overwhelm the SSA appeal apparatus. Thus, the Court is loath to impugn any malicious motive to the SSA in adopting the current procedure for terminating the SSI benefits of "ineligible" "rollbacks." While the plaintiff's file may be less complete than that of other "rollbacks," such a quirk— which is only speculative at best—is no basis for this Court to condemn as irrational the SSA's policy decision to determine ex parte the eligibility of "rollbacks" for SSI benefits. And although plaintiff is bereft of SSI benefits and did not have the opportunity in the first instance to present as much current and "live" evidence concerning his disability and concomitant eligibility for SSI benefits as he might have wished to, the fact remains that the SSA's form entitled "Request for Reconsideration," which a "rollback" must fill out and submit to the SSA in order to initiate review of an adverse eligibility determination, does provide a mechanism for presenting fresh and additional evidence showing that his "disability" satisfies SSI standards. Had plaintiff been so impelled, he could have sought the aid of an educated layman or lawyer to enable him to make a full and intelligent exposition of his case on the "Request for Reconsideration" form. Such an exposition is clearly absent from the form that is in the record in this case (Docket Item 2, Exhibit D), and the Court will not extrapolate or hypothesize a generalized condition or consequence pertaining to all "rollbacks" who have been denied SSI benefits ex parte. In short, the Court cannot conclude that the defendant's reconsideration-appeals procedure is so arbitrary that ex parte termination of plaintiff's SSI benefits is violative of the due process clause of the Fifth Amendment.

For the above reasons, the Court rejects plaintiff's argument based on the due process clause of the Fifth Amendment.

In view of the disposition of this case, the Court has also decided not to certify this action as a class action and to deny the post hearing motion to intervene as a party plaintiff filed by Henrietta A. Dorsey.

Accordingly, a judgment will be entered in accordance with this opinion.